**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

KREVOLIN & HORST, LLC

Plaintiff,

vs. Case No. 6:20-mc-00041-RBD-LHR

LIFEFORCE CYROBANK
SCIENCES, INC.

Defendant.

_________________________________/

**DECLARATION OF SYED M. RAHEEL IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMMENCE PROCEEDINGS SUPPLEMENTARY AND TO IMPLEAD THIRD PARTIES WITH INCORPORATED MEMORANDUM OF LAW**

I, Syed M. Raheel, declare as follows:

1. I am the owner of Lifeforce Cryobank Sciences, Inc. ("Lifeforce") and Cord for Life, Inc., over the age of 18, and make this declaration based on my personal knowledge and review of regularly maintained business records and documents filed in this case.

2. In approximately June 2009, Ramin Raheel and I founded Lifeforce as 50% partners, with Lifeforce to operate as a cryogenic processing and storage facility.

3. In 2015, the name "Cord for Life" was registered, so that one day, I could create a company focused on using cord blood for regenerative and medical purposes.

4. In December 2017, I formed Cord for Life, Inc. wanting to research different uses for cord blood.

5. Cord for Life, Inc. primarily focuses on medical research and using cord blood for regenerative and medical purposes.

6. Lifeforce never engaged in regenerative medicine and was never licensed to do so.

7. Cryogenic processing and storing cord blood is required for researching cord blood.

8. On March 1, 2018, Cord for Life, Inc. purchased the assets of Lifeforce Cryobank Sciences, Inc. to facilitate Cord for Life Inc.'s research through an Asset Purchase Agreement. A true and correct copy of this Agreement is attached hereto as Exhibit A.

9. I have previously explained the legitimate formation of Cord for Life, Inc., including the purchase of Lifeforce assets, to Krevolin & Horst, LLC in the original lawsuit it brought against me and Lifeforce to collect attorneys' fees.

10. Lifeforce remains an active entity for the purpose of pursuing a claim against its insurance carrier for the legal fees Krevolin seeks. The lawsuit against Lifeforce's insurance carrier—currently pending in the Eighteenth Judicial Circuit in and for Seminole County, Florida (Case No. 2019-CA-003040)—is for Krevolin's benefit.

I declare under the penalty of perjury that the foregoing is true and correct and that this Declaration is executed on this 5th day of January 2022 in Woodland Hills, California.

Syed M. Raheel

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

## LIFEFORCE CRYOBANK SCIENCES, INC.

a Delaware corporation,

SELLER

TO

## CORD FOR LIFE, INC.,

a Florida corporation,

PURCHASER

March 1, 2018

# Table of Contents

1. PURCHASE AND SALE OF ASSETS; CLOSING ..... 1
1.1 Purchased Assets ..... 1
1.2 Excluded Assets ..... 2
1.3 Purchase Price; Non-Competition Price; Allocation of Purchase Price ..... 2
1.4 No Assumption of Liabilities ..... 3
1.5 Time and Place of the Closing ..... 3
1.6 Procedure at the Closing ..... 3
2. REPRESENTATIONS AND WARRANTIES OF THE SELLER ..... 4
2.1 Organization, Power and Authority ..... 4
2.2 Financial Statements ..... 4
2.3 Liabilities ..... 4
2.4 Ownership of Purchased Assets ..... 4
2.5 Condition of the Purchased Assets ..... 4
2.6 Proprietary Rights ..... 5
2.7 Adequacy of the Purchased Assets ..... 5
2.8 Material Contracts and Financial Documents ..... 5
2.9 Insurance ..... 5
2.10 Litigation ..... 5
2.11 Records ..... 6
2.12 Changes Since Last Balance Sheet ..... 6
2.13 Compliance with Laws ..... 6
2.14 Due Authorization; Binding Obligation ..... 6
2.15 Accuracy of Information Furnished ..... 6
2.16 Copies of Documents ..... 7
3. REPRESENTATIONS AND WARRANTIES OF PURCHASER ..... 7
3.1 Organization, Power and Authority ..... 7
3.2 Due Authorization, Binding Obligation ..... 7
4. ADDITIONAL AGREEMENTS OF THE SELLER ..... 7
4.1 Conduct of Business Pending the Closing ..... 7
4.2 Access to the Seller's Records ..... 7
4.3 Retention of Shares ..... 7
4.4 Liability for Expenses ..... 8
4.5 Indemnification ..... 8
5. ADDITIONAL AGREEMENTS OF THE PURCHASER ..... 8
5.1 Indemnification ..... 8
5.2 Liability for Expenses ..... 9
5.3 Notice of Breach Prior to Closing ..... 9
6. CONDITIONS TO THE OBLIGATIONS OF THE PURCHASER ..... 9
6.1 Closing Certificate ..... 9
6.2 Certified Resolutions ..... 9
6.3 Receipt of Necessary Consents ..... 9
6.4 No Adverse Litigation ..... 9
7. ADDITIONAL AGREEMENTS OF THE PARTIES ..... 10
7.1 Power of Attorney ..... 10
7.2 Execution of Further Documents ..... 10

7.3 Subrogation of the Purchaser ........ 10
8. GENERAL PROVISIONS ........ 10
8.1 Survival of Representations and Warranties ........ 10
8.2 Brokers' Commission ........ 10
8.3 Amendment and Waiver ........ 10
8.4 Successors and Assigns ........ 11
8.5 Entire Agreement ........ 11
8.6 Headings ........ 11
8.7 Execution in Counterparts ........ 11
8.8 Notices ........ 11
8.9 Severability ........ 11
8.10 Rules of Construction ........ 12
8.11 Use of Certain Terms ........ 12
8.12 Governing Law ........ 12

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made this 1st day of March, 2018, by and among CORD FOR LIFE, INC., a Florida corporation (the "Purchaser"), and LIFEFORCE CRYOBANK SCIENCES, INC., a Delaware corporation (the "Seller").

## RECITALS

The Seller desires to sell, transfer and assign to the Purchaser and the Purchaser desires to purchase from the Seller substantially all of the assets, properties and business of the Seller, except for its franchise agreements and partnership agreements, all as hereinafter provided.

## AGREEMENTS

In consideration of the premises and the mutual representations, warranties and covenants and subject to the conditions herein contained, the parties agree as follows.

## 1. PURCHASE AND SALE OF ASSETS; CLOSING

1.1. **Purchased Assets.** The Seller agrees to and will sell, transfer, assign and deliver to the Purchaser at the Closing (as hereinafter defined), free and clear of all liens, claims and encumbrances (except those which the Purchaser has expressly agreed to assume in Section 1.3.1.2 hereof and except for a security interest claimed by Kazi Management VI, LLC, which is disputed by Seller), all assets of the Seller of every nature and kind, other than the Excluded Assets (as hereinafter defined), as they exist at the Time of Closing (as hereinafter defined), which assets are hereinafter collectively referred to as the "Purchased Assets" and include the following, without limitation:

1.1.1. All equipment, furniture and fixtures, and other fixed assets owned or leased by the Seller, as identified on Schedule 1.1.1 (the "Fixed Assets");

1.1.2. All inventories of Seller, wherever located, including all stem cell materials in storage, all collected blood samples in process, spare parts and all other materials and supplies to be used or consumed by Seller in the processing of blood, collection of stem cells from processed blood and storage of stem cells, (the "Inventory").

1.1.3. All of the Seller's right, title and interest in the contract and non-contract customer accounts, customer account contracts, and other rights to provide services to the customers of the Seller, as identified on Schedule 1.1.3 (the "Customer Accounts");

1.1.4. All of the Seller's agency agreements, permits, licenses, governmental approvals, contracts, franchises and franchise rights, patents, trademarks, tradenames, telephone numbers, rights to employ Seller's employees and other proprietary rights, all related to the Purchased Assets, as identified on Schedule 1.1.4 (the "Proprietary Rights");

1.1.5. All receivables of the Seller, including, without limitation, all trade and customer accounts receivable arising from service (specifically including future commissions and/or residuals on all future premiums paid by Seller's accounts), notes receivable and insurance proceeds receivable (the "Receivables")

1.1.6. All operating data, books. files, documents and records of the Seller related to the Purchased Assets, including without limitation customer lists, insurance policies, financial, accounting and credit records, marketing information, correspondence, budgets and other similar documents and records (the "Records");

1.1.7. All other known and unknown, liquidated or unliquidated, contingent or fixed rights, chooses in action or causes of action of every nature and kind which the Seller has or may have against any third party and all rights which Seller may have to any and all other assets of the Seller other than Excluded Assets (as hereafter defined);

1.1.8. All insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the effective date of this Agreement;

1.1.9. All rights of the Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof; and

1.1.10. Any and all goodwill related to the foregoing.

1.2. **Excluded Assets**. Anything to the contrary in Section 1.1 notwithstanding, the Purchased Assets shall exclude the following assets of the Seller (collectively, the "Excluded Assets"):

1.2.1. The consideration to be paid by the Purchaser and the Seller's other rights under this Agreement;

1.2.2. All cash;

1.2.3. The company minute books and membership records of the Seller.

1.2.4. All claims for refunds of taxes and other governmental charges of any nature.

1.2.5. The share of capital stock of Seller held in treasury.

1.2.6. All franchise agreements and partnership agreements.

1.3. **Purchase Price; Non-Competition Price; Allocation of Purchase Price.**

1.3.1. As consideration for the Purchased Assets, the Purchaser agrees, subject to the terms, conditions and limitations set forth in this Agreement:

1.3.1.1. To pay to the Seller the sum of Nine Million Dollars ($9,000,000.00) (the "Purchase Price") by executing and delivering a non-recourse unsecured promissory note (the "Promissory Note") in the form attached hereto as Exhibit A.

1.3.1.2. To assume and discharge when lawfully due those liabilities, contracts, commitments and other obligations of the Seller set forth in Schedule 1.3.1.2 (the "Assumed Liabilities").

1.3.1.3. The parties agree that the consideration for the Purchased Assets shall be allocated as follows:

| | |
|---|---|
| Laboratory Equipment | $71,376.58 |
| Computers & Printers | $18,126.00 |
| Administrative Furniture & Fixtures | $15,105.00 |
| Leasehold Improvements | $60,392.42 |
| Public Cord Blood Inventory Processing Costs | $8,585,000.00 |
| Goodwill | $250,000.00 |
| TOTAL | $9,000,000.00 |

1.4 **No Assumption of Liabilities.** Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, the Purchaser is not assuming or agreeing to pay any liabilities of the Seller whatsoever, specifically including, but not limited to, the following:

1.4.1 Any obligations or liabilities of the Seller arising under this Agreement;

1.4.2 Any obligation of the Seller for federal, state or local income tax liability (including interest and penalties) arising from the operations of the Seller up to the Time of Closing or arising out of the sale by the Seller of the Purchased Assets pursuant hereto;

1.4.3 Any obligation of the Seller for expenses incurred in connection with the sale of the Purchased Assets pursuant hereto;

1.4.4 Any other liability or obligation of the Seller whatsoever.

1.5 **Time and Place of the Closing.** The Closing of the sale of the Purchased Assets (the "Closing") shall take place at the offices of McCARTHY, SUMMERS, BOBKO, WOOD, NORMAN, BASS & MELBY, P.A., 2400 South Federal Highway, Fourth Floor, Stuart, Florida 34994 on or before March 1, 2018, (the "Time of Closing"), provided, however, that if any of the conditions precedent set forth in this Agreement have not been satisfied or waived by said date, then the Closing shall take place on a subsequent date, mutually determined by the Purchaser and the Seller.

1.6 **Procedure at the Closing.** At the Closing, the following steps will be taken by the parties and the completion of each step shall be a further condition to the Closing.

1.6.1 The Seller shall deliver to the Purchaser such deeds, bills of sale, endorsements, assignments and other instruments, in such form as are satisfactory to the Purchaser, as shall be sufficient to vest in the Purchaser good and marketable title to the Purchased Assets, free and clear of all liens, claims and encumbrances, except as otherwise permitted by or disclosed in this Agreement;

1.6.2 The Purchaser shall deliver to the Seller the Promissory Note in payment of the Purchase Price. The Purchase Price shall be adjusted for Personal Property Taxes and any other taxes or fees payable on the Purchased Assets allocated to time periods prior to Closing, with such taxes or fees being prorated between Purchaser and Seller as of the date of Closing.

## 2 REPRESENTATIONS AND WARRANTIES OF THE SELLER.

The Seller makes the following representations, warranties and covenants:

2.1 **Organization, Power and Authority**. The Seller is a corporation duly organized and legally existing in good standing under the laws of the State of Delaware, and has full corporate power and authority (a) to own or lease its properties and to carry on its business as it is now being conducted, (b) to enter into this Agreement and to sell, convey, assign, transfer and deliver the Purchased Assets to the Purchaser as provided herein, and (c) to carry out the other transactions and agreements contemplated hereby.

2.2 **Financial Statements**. The Purchaser acknowledges and represents that it is familiar with the Seller's financial statements, financial condition and tax returns, and further acknowledges that the Seller has a history of negative cash flow in the approximate amount of -$65,000 per month.

2.3 **Liabilities**. The Seller has no liabilities or obligations which would adversely affect the Purchased Assets, either accrued, absolute, contingent or otherwise, except to the extent clearly disclosed and specifically set forth in Schedule 1.3.1.2.

2.4 **Ownership of Purchased Assets.** The Seller has good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all title defects, liens, claims or other encumbrances of any kind or character, except:

2.4.1 Liens for current taxes, assessments and governmental charges not yet due and payable; and

2.4.2 Liabilities set forth in Schedule 1.3.1.2.

2.4.3 A security interest claimed by Kazi Management VI, LLC, which is disputed by the Seller.

2.5 **Condition of the Purchased Assets**. Except as indicated in Schedule 2.5, the Purchased Assets are in operating condition, normal wear and tear excepted.

2.6 **Proprietary Rights**. To the best of their knowledge after reasonable investigation, the Seller possesses all of the permits, licenses, governmental approvals, contracts, franchises and franchise rights, patents, trademarks, tradenames, corporate names and other proprietary rights, which are necessary for the conduct of the business of the Seller in the manner in which and the extent to which it is currently being conducted. Schedule 1.1.4 contains a complete and accurate list of the Proprietary Rights.

2.7 **Adequacy of the Purchased Assets**. The Seller does not know of any fact, event or action which could result in a material adverse change in the business, prospects, financial condition or results of operations of the Seller or the operation or ownership of the Purchased Assets by the Purchaser following the Time of Closing.

2.8 **Material Contracts and Financial Documents**. Schedule 2.9 attached hereto contains an accurate and complete list of the following:

2.8.1 Each promissory note, loan agreement, credit agreement, personal property lease, guarantee, security agreement or similar document or instrument to which the Seller is a party or by which it is bound and which relate to the Purchased Assets;

2.8.2 Each other agreement, contract or commitment to which the Seller is a party or by which it is bound and which is material to the operation of the Purchased Assets.

2.9 **Insurance**. Set forth in Schedule 2.9 hereto is a list of all policies of liability, property damage, fire, workers' compensation/employer's liability, errors or omissions or other forms of insurance owned or carried at any time by the Seller and insurance agents and/or brokers providing such insurance coverage and of all performance bonds and letters of credit relating to the Purchased Assets securing any obligations of the Seller at any time maintained by the Seller in the conduct of its business. The Seller has complied with all applicable terms and conditions, including payment of premiums, with respect to such insurance policies and performance bonds. The Seller has received no notification from any insurance carrier denying or disputing any claim made by the Seller, denying or disputing any coverage for any such claim, denying or disputing the amount of any claim, or regarding the possible cancellation of or premium increases with respect to any policies. The Seller has no claim pending or anticipated against any of the insurance carriers under any of such policies and there has been no actual or alleged occurrence of any kind which may give rise to any such claim.

2.10 **Litigation**. Except as set forth in Schedule 2.10, there are no actions, suits, claims, governmental investigations or arbitration proceedings pending or to the knowledge of the Seller threatened against or affecting the Seller or any of the Purchased Assets and, to the best of the knowledge of the Seller, there is no basis for any of the foregoing. There are no outstanding orders, decrees or stipulations issued by any local, state or federal judicial authority in any proceeding to which the Seller is or was a party or by which the Seller is bound. The insurance coverages of the Seller are adequate in character and amount to pay all liabilities relating to the matters described in Schedule 2.10.

2.11 **Records**. The Records are accurate and complete in all material respects and there are no material matters as to which appropriate entries have not been made in the Records.

2.12 **Changes Since Last Balance Sheet**. Except as disclosed in Schedule 2.12, since the date of the Last Balance Sheet:

2.12.1 There has been no material adverse change in the business, property, employee relations, financial condition or results of operations of the Seller;

2.12.2 The Seller has not sold or transferred any of its assets other than in the ordinary course of business;

2.12.3 The Seller has not made or obligated itself to make any material capital expenditures;

2.12.4 No material obligations or liabilities (including any indebtedness) have been incurred and no material transactions have been entered into, except for this Agreement and the transactions contemplated hereby; and

2.12.5 The Seller has not suffered any theft, damage, destruction, casualty loss or other material change, materially and adversely affecting the Purchased Assets.

2.13 **Compliance with Laws**. The Seller has operated from its inception, and will continue to operate through the Time of Closing, legally and in compliance with all applicable laws, regulations, permits, franchises, licenses and orders.

2.14 **Due Authorization; Binding Obligation**. The execution, delivery and performance of this Agreement and each of the other agreements and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action of the Seller. This Agreement has been duly executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable in accordance with its terms. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will: (a) conflict with or violate any provision of the Seller's articles of incorporation or bylaws, or of any law, ordinance or regulation or any decree or order of any court or administrative or other governmental body which is either applicable to, binding upon or enforceable against the Seller; (b) result in any breach of or default under any mortgage, contract, agreement, indenture, will, trust or other instrument which is either binding upon or enforceable against the Seller, or the Purchased Assets, or (c) impair or in any way limit any governmental or official license, approval, permit or authorization of the Seller.

2.15 **Accuracy of Information Furnished**. No representation, statement or information made or furnished by the Seller to the Purchaser, including those contained in this Agreement and the various Schedules attached hereto, contains or shall contain any untrue statement of a material fact or omits or shall omit any material fact necessary to make the information contained therein and herein not misleading.

2.16 **Copies of Documents**. At or prior to the Time of Closing, the Seller has furnished the Purchaser with a true and complete copy of each agreement, contract or other document listed on the Schedules hereto. There has not been any default in any obligation to be performed by the Seller under any such agreement.

## 3 REPRESENTATIONS AND WARRANTIES OF PURCHASER.

The Purchaser makes the following representations and warranties:

3.1 **Organization, Power and Authority**. The Purchaser is a corporation duly organized and validly existing under the laws of the State of Florida, with full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

3.2 **Due Authorization, Binding Obligation**. The execution, delivery and performance of this Agreement and all other agreements contemplated hereby and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser and is a valid and binding obligation of the Purchaser enforceable in accordance with its terms.

## 4 ADDITIONAL AGREEMENTS OF THE SELLER.

4.1 **Conduct of Business Pending the Closing**. From and after the execution and delivery of this Agreement and until the Time of Closing, except as otherwise provided by the prior written consent of the Purchaser, the Seller will conduct its business and operations in the manner in which the same have heretofore been conducted, and it will use its best efforts to (i) preserve its business organization intact, (ii) keep available to the Purchaser the services of its officers, employees, agents and distributors, and (iii) preserve its relationships with its customers and suppliers.

4.2 **Access to the Seller's Records**. From and after the execution and delivery of this Agreement, the Seller will afford to the representatives of the Purchaser access, after normal business hours and upon reasonable notice, to the Seller's premises sufficient to enable the Purchaser to inspect the Purchased Assets, and the Seller will furnish to such representatives during such period all such information relating to the foregoing investigation as the Purchaser may reasonably request; provided, however, that any furnishing of such information to the Purchaser and any investigation by the Purchaser shall not affect the right of the Purchaser to rely on the representations and warranties made by the Seller in or pursuant to this Agreement.

4.3 **Retention of Shares**. The Seller will not, prior to the Time of Closing, permit any shareholder to sell, assign, transfer, pledge, encumber or otherwise dispose of any of the shares of capital stock of the Seller or any interest therein.

4.4 **Liability for Expenses**. The Seller will pay all expenses incurred by the Seller, in connection with the negotiation, execution and performance of this Agreement, whether or not the transactions contemplated hereby are consummated, including the fees and expenses of agents, representatives, accountants and counsel for the Seller.

4.5 **Indemnification**. The Seller agrees that it will defend, indemnify and hold the Purchaser and its affiliates harmless from and against all indemnifiable damages of the Purchaser. For this purpose, "indemnifiable damages" of the Purchaser means the aggregate of all expenses, losses, costs, deficiencies, liabilities and damages (including attorneys' fees and court costs) incurred or suffered by the Purchaser, or any of its directors, employees or affiliates, as a result of or in connection with: (a) any inaccurate representation or warranty made by the Seller in or pursuant to this Agreement, (b) any default in the performance of any of the covenants or agreements made by the Seller in this Agreement, (c) any failure of the Seller to pay, discharge or perform any of the Excluded Liabilities, or any asserted liability resulting from any dispute or claim against Purchaser concerning any of the Excluded Liabilities, or (d) any occurrence, act or omission of any shareholder, director, officer, employee, consultant or agent of the Seller which occurred prior to the Closing, causes damage to the Purchaser or its affiliates and is not clearly disclosed in this Agreement or any Schedule hereto.

4.6 **Use of Address and Phone Numbers**. While any sums remain outstanding on the Promissory Note, the Purchaser shall permit the Seller to use Purchaser's mailing address and telephone numbers for no additional fees or charges.

4.7 **Use of Licenses**. While any sums remain outstanding on the Promissory Note, the Seller and the Purchaser agree to permit all licenses and permits used, required or otherwise maintained by either of them to be used by the other party during the normal course of business, without any additional fees or charges. Each party agrees to keep all licenses and permits in full force and effect while such licenses and permits are needed by either party. Each party agrees to cooperate with the other party in any actions or filings which may be required to maintain all of their respective licenses and permits in full force and effect.

## 5 ADDITIONAL AGREEMENTS OF THE PURCHASER.

5.1 **Indemnification**. The Purchaser agrees that it will defend, indemnify and hold the Seller harmless from and against all indemnifiable damages of the Seller. For this purpose, "indemnifiable damages" of the Seller means the aggregate of all expenses, losses, costs, deficiencies, liabilities and damages (including attorneys' fees and court costs) incurred or suffered by the Seller, as a result of or in connection with:

5.1.1 Any inaccurate representation or warranty made by the Purchaser in or pursuant to this Agreement;

5.1.2 Any default in the performance of any of the covenants or agreements made by the Purchaser in this Agreement;

5.1.3 Any failure of the Purchaser to pay, discharge or perform any of the Assumed Liabilities, or any asserted liability resulting from any dispute or claim against the Seller concerning any of the Assumed Liabilities; or

5.1.4 Any occurrence, act or omission of any shareholder, director, officer, employee, consultant or agent of the Purchaser which occurred subsequent to the Closing.

5.2 **Liability for Expenses.** The Purchaser will pay all expenses incurred by it in connection with the negotiation, execution and performance of this Agreement, whether or not the transaction contemplated hereby is consummated, including the fees and expenses of its counsel and auditors.

5.3 **Notice of Breach Prior to Closing.** In connection with any investigation of the Seller made by the Purchaser pursuant to Section 4.2 hereof, Purchaser agrees to notify the Seller prior to Closing if it becomes aware that Seller has breached a representation or warranty made hereunder.

## 6 CONDITIONS TO THE OBLIGATIONS OF THE PURCHASER.

The obligation of the Purchaser to purchase the Purchased Assets shall be subject to the fulfillment at or prior to the Time of Closing of each of the following conditions:

6.1 **Closing Certificate.** The representations and warranties of the Seller contained in this Agreement and the Schedules hereto shall have been true and correct as of the date hereof, and they shall be true and correct as of the Time of Closing. The Seller shall have performed and complied with all of its obligations required by this Agreement to be performed or complied with at or prior to the Time of Closing. The Seller shall have delivered to the Purchaser a certificate, dated as of the date of the Closing, certifying that such representations and warranties are true and correct and that all such obligations have been performed and complied with.

6.2 **Certified Resolutions.** The Seller shall have delivered to the Purchaser copies of resolutions adopted by the board of directors and the shareholders of the Seller authorizing the transactions contemplated by this Agreement, certified in each case as of the Time of Closing by the Secretary or Assistant Secretary of the Seller.

6.3 **Receipt of Necessary Consents.** All necessary consents or approvals of third parties to any of the transactions contemplated hereby, the absence of which would adversely affect the Purchaser's rights hereunder, shall have been obtained and evidenced by written documentation satisfactory to the Purchaser.

6.4 **No Adverse Litigation.** There shall not be pending or threatened any action or proceeding by or before any court or other governmental body which shall seek to restrain, prohibit or invalidate the sale of the Purchased Assets to the Purchaser or any other transaction contemplated hereby, or which might affect the right of the Purchaser to own, operate in its entirety or control the Purchased Assets, and which, in the judgment of the Purchaser, makes it inadvisable to proceed with the transaction contemplated hereby.

## 7 ADDITIONAL AGREEMENTS OF THE PARTIES.

7.1 **Power of Attorney.** Effective as of the Time of Closing, the Seller hereby constitutes and appoints the Purchaser and its successors and assigns, as the true and lawful attorney of the Seller: (i) to institute and prosecute all proceedings which the Purchaser may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Purchased Assets as provided for in this Agreement, (ii) to defend or compromise any and all actions, suits or proceedings in respect of any of the Purchased Assets, and to do all such acts and things in relation thereto as the Purchaser shall deem advisable, and (iii) to take all action which the Purchaser may reasonably deem proper in order to provide for the Purchaser all benefits relating to the Purchased Assets where any required consent of another party to the sale or assignment thereof to the Purchaser shall not have been obtained. The Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable. The Purchaser shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

7.2 **Execution of Further Documents.** From and after the Time of Closing, upon the reasonable request of the Purchaser, the Seller shall execute, acknowledge and deliver all such further documents as may be required to convey and transfer to and vest in the Purchaser and protect its right, title and interest in all of the Purchased Assets, and as may be appropriate otherwise to carry out the transactions contemplated by this Agreement.

7.3 **Subrogation of the Purchaser.** In the event that the Purchaser shall become liable for or suffer any damage with respect to any matter which was covered by insurance maintained by the Seller on or prior to the Time of Closing, the Purchaser shall be and hereby is subrogated to any rights of the Seller under such insurance coverage, and, in addition, the Seller agrees to promptly remit to the Purchaser any insurance proceeds which it may receive on account of any such liability or damage.

## 8 GENERAL PROVISIONS.

8.1 **Survival of Representations and Warranties.** All of the respective representations and warranties of the parties to this Agreement shall survive the consummation of the transactions contemplated hereby.

8.2 **Brokers' Commission.** Each party hereto will indemnify and hold harmless each other party from any commission, fee or claim of any person, firm or corporation employed or retained or claiming to be employed or retained by the indemnifying party to bring about, or to represent it in, the transactions contemplated hereby.

8.3 **Amendment and Waiver.** This Agreement may be amended, or any provision of this Agreement may be waived, provided that any such amendment or waiver will be binding on a party only if amendment or waiver is set forth in a writing executed by that party. No course of dealing between or among any persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any person under or by reason of this Agreement.

8.4 **Successors and Assigns**. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party, which consent shall not be unreasonably withheld.

8.5 **Entire Agreement**. This instrument and the Schedules attached hereto contain the entire agreement of the parties hereto with respect to the purchase of the Purchased Assets and the other transactions contemplated herein, and supersede all prior understandings and agreements of the parties with respect to the subject matter hereof. Any reference herein to this Agreement shall be deemed to include the Schedules attached hereto.

8.6 **Headings**. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way effect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

8.7 **Execution in Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

8.8 **Notices**. All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and will be deemed to have been given when personally delivered, sent via facsimile during business hours on weekdays (excluding Federal holidays), or mailed postage prepaid by first class mail, return receipt requested. Notices, requests, demands and other communications will, unless another address is specified in a writing delivered to the other party, be sent to the address as indicated below:

| | |
|---|---|
| If to Seller: | Syed Raheel<br>Lifeforce Cryobank Sciences, Inc.<br>270 Northlake Boulevard<br>Altamonte Springs, FL 32701 |
| If to Purchaser: | Syed Raheel<br>Cord for Life, Inc.<br>270 Northlake Boulevard<br>Altamonte Springs, FL 32701 |

8.9 **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions of this Agreement; provided that if prohibition or invalidation of any provision of this Agreement materially diminishes the consideration payable to any party hereunder, such party shall have the right to rescind this Agreement and the transactions contemplated hereunder.

8.10 **Rules of Construction.** The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.

8.11 **Use of Certain Terms.** The term "Seller" shall also include all predecessors of the Seller and businesses acquired by or merged with the Seller.

8.12 **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts made and to be performed therein.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WITNESSES:**

By: [signature]

Print Witness Name: Shane Hoffman

By: [signature]

Print Witness Name: Stephen Rousselet

**SELLER:**

Lifeforce Cryobank Sciences, Inc., a Delaware corporation

By: [signature]

Syed Raheel, President

**WITNESSES:**

By: [signature]

Print Witness Name: Shane Hoffman

By: [signature]

Print Witness Name: Stephen Rousselet

By: ~~Print Witness Name~~: [signature]

**PURCHASER:**

Cord for Life, Inc., a Florida corporation

By: [signature]

Syed Raheel, President

# SCHEDULE 1.1.1

## FIXED ASSETS

## SCHEDULE 1.1.3

## CUSTOMER ACCOUNTS

# SCHEDULE 1.1.4

## PROPRIETARY RIGHTS

# SCHEDULE 1.3.1.2

## ASSUMED LIABILITIES

1. Seller's obligations in contract between Seller and Bergen Community Regional Blood Center d/b/a Community Blood Services, a New Jersey not-for-profit corporation dated March 25, 2014.

2. Seller's obligations in Five (5) Year Lease Agreement between Seller and bioMérieux, Inc. dated June 6, 2017.

3. Seller's obligations in Lease Agreement between Seller and ThermoFisher Scientific dated June 6, 2017.

4. Seller's obligations in Clinical Laboratory Service Agreement between Seller and LABS, Inc. dated December 1, 2016.

5. Obligations of Seller in Service Agreement between Seller and VetiCell, LLC dated July 24, 2015.

6. Seller's obligations in Lease Agreement between Seller and Lasbury Family Limited, LLLP, dated November 22, 1995, as amended January 23, 2001, July 29, 2005,March 20, 2011, and April 8, 2014.

7. Seller's obligations in Quality Agreement between Seller and Americord Registry, LLC dated January 26, 2017.

8. Seller's obligations in Cord Blood and Birth Tissue Stem Cell Manufacturing Agreement between Seller and Americord Registry, LLC effective January 25, 2017.

9. Seller's obligations in Novation Agreement between Seller, Cryobanks International, Inc. and National Marrow Donor Program effective June 28, 2010, concerning Cord Blood Bank Participation Agreement between Cryobanks International, Inc. and National Marrow Donor Program effective October 1, 2005.

10. Seller's obligations in Manufacturing Agreement between Seller and Aedicell, Inc. dated August 9, 2012

11. Obligations of Cryobanks International, Inc. in Procurement Agreement between Cryobanks International, Inc. and Stork Medical, LLC, dated June 1, 2010.

# SCHEDULE 2.2

## FINANCIAL STATEMENTS

# SCHEDULE 2.5

## CONDITION OF PURCHASED ASSETS

All in working condition.

# SCHEDULE 2.8

## MATERIAL CONTRACTS AND FINANCIAL DOCUMENTS

# SCHEDULE 2.9

## INSURANCE POLICIES

**SCHEDULE 2.10**

**LITIGATION**

1. Prior litigation between the Seller and Alpha Cord. which has been resolved; however, there remains unresolved a claim for attorneys' fees by the law firm representing Seller in that litigation. Purchaser is not assuming any liability for such attorneys' fees or costs from the litigation between Seller and Alpha Cord.

# SCHEDULE 2.12

## CHANGES SINCE LAST BALANCE SHEET